UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| GENA FOX, f/k/a GENA EVERETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-CV-265 |
| | ) | REEVES/LEE |
| HOENIGSBERG & DUEVEL CORPORATION, | ) | |
| HOENIGSBERG & DUEVEL DATENTECHNIK | ) | |
| GmbH d/b/a HOENIGSBERG & DUEVEL | ) | |
| INTERNATIONAL GROUP, and | ) | |
| HCL TECHNOLOGIES LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Gena Everett brings claims for sexual harassment, retaliation, and religious discrimination pursuant to Title VII against her former employers, the Hoenigsberg & Duevel defendants.

This matter is before the court on defendants' motions to dismiss. Defendants state that plaintiff's claim of religious discrimination fails because she has not asserted her trip to Nashville for Easter was due to a sincere religious belief, as opposed to personal preference; and she failed to exhaust Title VII administrative remedies as to Hoenigsberg & Duevel International Group (H&D Int'l) and HCL Technologies LTD (HCL). In addition, H&D Int'l states the court lacks personal jurisdiction over it. Because Everett pleads facts sufficient to state a plausible cause of action against all defendants, the motions to dismiss will be denied.

## I. Background

Everett was employed by Hoenigsberg & Duevel Corporation (H&D) in IT operations from September 23, 2014 until her termination around the end of August 2017. The H&D defendants are information technology providers. Everett was assigned to work on a project for Stabilus, Inc. that required travel to all Stabilus locations in North America to assist with PC migration. Everett states that on her second day on the job at the Stabilus, Farmington Hills location, Stabilus employee Louis Barnhart asked her questions about her personal life. Barnhart also made comments about Everett being female and stated he expected the project to be a "disaster," as a result.

When Everett made her second trip to Farmington Hills, Barnhart made several unwelcome comments about Everett's "ass" and began to describe what he "would like to do" to Everett. Barnhart told Everett she was going to be in Farmington Hills for a long time and he could "take care of all [her] sexual needs." Although Everett told Barnhart she was married and he needed to refrain from making such comments, Barnhart persisted in making improper, harassing, and unwelcome sexual comments to her over the next few days. Finally, Everett lost her composure and told Barnhart, in no uncertain terms, that his comments and advances were unwelcome and she was not interested in him.

Thereafter, Everett states Barnhart became hostile and aggressive towards her. He stopped being cooperative in IT matters and demanded Everett get upper-level males from H&D involved in the project. During a Skype call with H&D executives, Everett informed them she was getting no cooperation from Barnhart because she had rejected his advances and he continued his harassment and inappropriate sexual comments and innuendos. Their

2

response was, "We are sorry that you are having a difficult time; but, this is an important client, and we need you to stay on task and finish the job."

Everett continued her work at Farmington Hills and tried to accelerate the process; however, Barnhart became physically aggressive, grabbing Everett's "ass" and cornering her in a room alone, telling her that "there would be nothing she could do if he decided he wanted her then and there." Everett contacted her project manager, Brandon Miller, and told him what was happening with Barnhart. She told Miller she would no longer be on-site at Farmington Hills after hours or on weekends when there was no one else there, although she had been working those hours in an attempt to complete the project. Miller told Everett he knew she was "tough," and to "just get the job done." Two other executives, Egerer and Walberer, were notified about the harassment, but the response to Everett was to "suck it up."

Everett finally spoke to someone she believed to be the president of the client and requested more professional cooperation and behavior from his staff. She told him that Barnhart was extremely unprofessional. Everett returned to her Chattanooga office a few days later. She told her supervisors about Barnhart's continuing unwelcome and harassing behavior. Everett continued working on the Stabilus project, but she made certain neither she nor any other female H&D employee was ever alone with Barnhart.

Near the end of April 2017, the migration team was instructed to go to Farmington Hills to begin the data migration. Everett was working 14 – 16 hours per day, starting her days at 2 a.m. in order to accommodate Germany's (H&D Int'l) working hours and have Skype meetings with German executives to provide updates and discuss ongoing problems.

3

While the data was being migrated in the Michigan locations, Everett went to the Stabilus location in Gastonia, North Carolina to prepare for its data migration. When she first arrived, she found no testing or other preparation for the data migration had been completed. Everett met with all department heads from the Gastonia location and advised them of the work needed before migration. Everett told Sherry Christopher, a Stabilus employee, about the harassment by Barnhart and that the other female employees were afraid of him. Christopher asked Everett if she wanted Christopher to report Barnhart to the HR department at Stabilus. Everett told her the H&D executives were aware of the harassment and an HR complaint to Stabilus would just get Everett fired by H&D. Everett did advise Christopher to make inquires of other females, since other female employees had expressed their fears about Barnhart's behavior towards them. When she returned to Farmington Hills, Everett continued to be harassed by Barnhart. Barnhart even showed up at the hotel where Everett was staying twice, asking her to get a drink with him.

Everett asserts that after she complained of the harassment, she received expanded assignments and additional reporting requirements from the H&D defendants. She requested assistance from her supervisors, but adequate help was not provided. Everett also told Walberer about her extended travel schedule and she was unhappy that she was not being allowed to be home for one-week periods as promised. He told her to fly home on weekends when she could. Everett requested she be allowed to do some work from home; however, her request was denied, as Stabilus requested she be on-site.

Before Easter weekend in 2017, Everett was instructed by H&D that she was to go to Farmington Hills. When Everett told her supervisors the Easter holiday was coming up and she wished to go home to celebrate the religious holiday with her family, executives in Germany told her she could go home for Easter from Farmington Hills. After Everett and the data migration team arrived in Farmington Hills, she learned the plant would be closed the week preceding Easter. Everett then had a Skype call with Walberer and he instructed her to have the team stay in Michigan, then resume work the Monday following Easter. Everett made travel arrangements to go to Nashville to spend Easter with her family, and return to Farmington Hills the afternoon of Easter to complete some work for H&D.

As the Farmington Hills project was being completed, Everett and a team went to Gastonia and found there had still been no site testing or preparation for its data migration. Everett sent the migration team back to Chattanooga, while she stayed in Gastonia to complete the testing herself, even though testing was not part of her original assignment from H&D. Later, Everett was accused of "not doing her job" because the testing had not been completed to allow for timely data migration.

Around the same time, Everett began travelling to the Stabilus location in Mexico. She was also assigned to go to yet another Stabilus location, where she tested a few machines and found none had been tested and were ready for data migration. At Everett's suggestion, H&D agreed she should be assigned to go to that location and personally oversee testing and preparation to make certain it would be ready for migration.

5

Despite Everett advising her supervisors on multiple occasions of issues with billing and documentation on the project, she was told she had failed to manage the job properly and was removed from oversight of the Stabilus project and demoted. Everett was also reprimanded by her supervisor for flying home on Easter weekend. Everett reminded him that her trip had been preapproved and that she celebrated Easter every year, including the traditions of Lent. Brandon Miller later came to her office and told her to go "work from home until [she] found other employment."

Everett alleges she was forced to work in a sexually hostile environment because she was subjected to sexually explicit remarks and unwelcome advances of Barnhart on an ongoing basis, even after she reported his behavior to the H&D defendants. The defendants refused to take prompt, remedial action in response to her complaints of sexual harassment and ignored her complaints, telling her to "suck it up" and that she was "strong" and "could take it." Everett also alleges she was subjected to religious discrimination when defendants gave permission for her to fly from Farmington Hills to Tennessee to celebrate Easter with her family, then chided and disciplined her for doing so. Finally, Everett alleges she faced retaliation for exercising her protected civil rights in the heightened scrutiny of her work and travel arrangements, resulting in termination of employment.

## II. Religious Discrimination

Defendants' motions to dismiss are brought under Federal Rule of Civil Procedure 12(b)(6). Under this rule, a purported cause of action may be dismissed when the complaint fails to state a claim upon which relief can be granted. For a complaint to proceed beyond a motion to dismiss under Rule 12(b)(6), it must meet two criteria: (1) it must assert a

6

plausible claim, and (2) it must set forth sufficient factual allegations to support that claim. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007)). When reviewing a motion to dismiss, the court must accept all factual allegations contained within the complaint as true. It must also view the facts in a light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), 555-56. Legal conclusions must be supported by factual allegations and may not consist of "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts . . ." *Hunter v. Diversified Consultants, Inc.*, 2014 WL 6747153, at *1 (M.D. Fl. Nov. 26, 2014) (quoting *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003)).

While the court must accept all factual allegations contained within the complaint as true, it need not apply that same standard to legal conclusions. Therefore, recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Twombly*, 550 U.S. at 555. Although for the purposes of a motion to dismiss the court must take all the factual allegations in the complaint as true, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 554).

Defendants argue Everett fails to allege sufficient facts to establish a claim for relief for religious discrimination under Title VII. Specifically, defendants aver Everett has not asserted her trip to Nashville for Easter was due to a sincere religious belief, as opposed to personal preference. In support of the motion, defendants state Everett alleges that she traveled from Michigan to Tennessee for the Easter holiday with "the majority of her

7

family" and when she returned, she was reprimanded for taking the trip. She does not allege she was required to work on Easter or that she held a sincere religious belief that dictated she spend Easter with her extended family in Nashville, as opposed to observing the holiday in Michigan. Because Everett fails to set forth a plausible case for religious discrimination, defendants assert her claim should be dismissed.

Everett responds her desire to take leave to observe Easter with her family was a protected religious observance. Thus, she states a plausible claim for religious discrimination. The court agrees.

Title VII makes it unlawful to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a). Title VII broadly defines "religion" to mean "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(j). The analysis of any religious discrimination case begins with the question of whether the employee has established a *prima facie* case of religious discrimination. *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987). In order to establish a *prima facie* case, a plaintiff must show (1) she holds a sincere religious belief that conflicts with an employment requirement, (2) she has informed the employer about the conflict, and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper v. Potter,* 505 F.3d 508, 514 (6th Cir. 2007).

For purposes of the motion to dismiss, the court finds Everett has stated a *prima facie* case for her religious discrimination claim. First, she has shown she holds a sincere religious belief that conflicted with an employment requirement. Second, Everett informed her supervisors that she wished to go home to celebrate Easter with her family and that she

8

celebrates Easter every year, including the traditions of Lent. Third, her supervisors told her she could go home for Easter, which she did, returning to Farmington Hills on the afternoon of Easter. Later, she was reprimanded for flying home on Easter weekend.

Defendants argue Everett's request to fly home amounts to a personal preference, not a religious requirement. The court disagrees.

In *Jiglov v. Hotel Peabody,* the plaintiff alleged his religious beliefs as a Russian Orthodox Christian required that he not only take leave to observe Easter, but also that he specifically do so with family members. The court found taking leave to observe Easter, and the time and place of such observation, were both products of sincere religious beliefs. *Jiglov,* 719 F.Supp.2d 918, 928-29 (W.D.Tenn. 2010). Here, the court finds Everett has stated that her desire to return to Tennessee to spend Easter with her family was a protected religious observance, not simply a personal preference. Everett did not have a duty to divulge all of the details of the religious content of her Easter observance with her supervisors, only advise H&D that she needed the day off for religious reasons. *See id.* at 930-31. At the motion to dismiss stage, Everett has met her burden of pleading a claim that is plausible on its face. Defendants' motions to dismiss this claim are **DENIED.**

### III. Failure to Exhaust Administrative Remedies

Defendants H&D Int'l and HCL assert the court lacks subject matter jurisdiction over them due to Everett's failure to exhaust her administrative remedies, stating she did not name either defendant in her charge filed with the EEOC.

Everett responds H&D Int'l and H&D are essentially the same company; therefore, it was unnecessary to include H&D Int'l in the EEOC proceedings and its absence from

9

the EEOC proceedings did not result in any actual bias towards it. Further, H&D Int'l had a relationship directly with Everett through H&D. As to HCL, Everett states H&D Int'l and H&D were both acquired by HCL and had notice of the EEOC charge upon acquisition. HCL, as a successor employer, then assumed liability for her EEOC charge.

An administrative charge must be filed with the EEOC before a discrimination plaintiff can bring a Title VII action in federal court. *Romain v. Kurek*, 836 F.2d 241, 245 (6th Cir. 1987). Generally, a party must be named in the EEOC charge before that party may be sued under Title VII. *Id.* However, the failure to name a Title VII defendant as a respondent in the EEOC charge may be excused if an "identity of interest" is found to exist between named and unnamed parties. *Id.*

The Sixth Circuit uses two tests for determining whether a party shares an "identity of interest" with another party that would excuse a failure to name the party in the EEOC charge. *Id.* Under the first test, an identity of interest exists "where the unnamed party has been provided with adequate notice of the charge under circumstances which afford it an opportunity to participate in conciliation proceedings aimed at voluntary compliance. *Id.* Under the second test, a court "looks at the relationship between the named and unnamed parties at the time the charge is filed and conciliation efforts occur. *Id.* In looking at the relationship, the court examines four factors:

> (1) Whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> (2) Whether, under the circumstances, the interests of a named party are so similar as the unnamed parties that for the purpose of obtaining voluntary

10

conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings.

(3) Whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and

(4) Whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 246.

Here, Everett's complaint alleges she received direction and supervision from both H&D and H&D Int'l. Further, H&D Int'l agreed to pay Everett for her work at Stabilus. Everett was told to send all her time to H&D Int'l on a weekly basis, and it was H&D Int'l that instructed Everett to be in Michigan over the Easter holiday and who gave her permission to leave for Easter. It is H&D Int'l that lists jobs and makes hiring decisions for employees to work at the Chattanooga, Tennessee H&D location. And, the H&D Int'l website lists Chattanooga, Tennessee as one of its locations. At the motion to dismiss stage, these facts show a plausible claim that an identity of interests exists between H&D Int'l and H&D.

The court has also considered whether H&D Int'l and H&D may be considered as "one employer" under the standard adopted in *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). Under the "single employer" or "integrated enterprise" doctrine, two companies may be considered so interrelated that they constitute "one employer." In determining whether to treat two entities as a single employer, the court examines four factors: (1) interrelation of operations, *i.e.,* common offices, common record keeping, shared bank accounts and equipment; (2) common management, common

11

directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *Id.* at 994. None of these factors is conclusive, and all four need not be met in every case – control over labor relations is the central concern. *Id.*

For the reasons just discussed, the court finds Everett has stated facts sufficient to support a plausible claim that H&D Int'l and H&D could be found to be one employer. Everett took direction, was supervised, answered to, was paid by, and reported to H&D Int'l.

As to HCL, Everett alleges that H&D Int'l and H&D were both acquired by HCL after she filed her EEOC charge, and had notice of the EEOC charge upon acquisition. Thus, HCL is a successor employer, who assumed liability after the EEOC charge had been filed.

The Sixth Circuit recognizes that liability may be imposed upon a corporate successor under Title VII for unfair employment practices of the predecessor company. *EEOC v. MacMillian Bloedel Containers, Inc.,* 503 F.2d 1086, 1091 (6th Cir. 1974). Liability of a corporate successor under Title VII is not automatic, but must be determined on a case-by-case basis. *Id.* Liability of a successor company for unfair employment practices of its predecessor depends upon such factors as (1) whether successor company had notice of the charge, (2) ability of predecessor to provide relief, (3) whether there has been a substantial continuity of business operations, (4) whether successor uses same plant, (5) whether successor uses same or substantially same work force, (6) whether successor uses same or substantially the same supervisory personnel, (7) whether same jobs exist

12

under substantially same working conditions, (8) whether successor uses same machinery, equipment and methods of production, and (9) whether successor produces same product. *Id.* at 1094. Everett will need discovery to establish her claim at trial, but at this point in the proceedings, the court finds that Everett has stated a plausible claim for relief against HCL as corporate successor to H&D and H&D Int'l.

## **IV. Personal Jurisdiction over H&D Int'l**

Last, H&D Int'l asserts the court lacks personal jurisdiction over it in this action. In support of the motion, H&D Int'l states it is a German company with its headquarters in Wolfsburg, Germany. It does not conduct any business, have any employees, or own property in Tennessee. It does not market or ship any products into Tennessee. In addition, H&D Int'l and H&D do not share employees, addresses, or telephone numbers; they do not maintain common books, tax returns or financial statements. They have separate websites. H&D Int'l does not control the day to day operations of H&D. H&D Int'l argues these facts simply do not show that H&D Int'l controls H&D to such a degree that H&D Int'l is the alter-ego of H&D.

A district court may dismiss a complaint for lack of personal jurisdiction upon motion of a party. Fed. R. Civ. P. 12(b)(2). In response to such a motion, the plaintiff bears the burden of proving that the court's exercise of personal jurisdiction is proper by a preponderance of the evidence. *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). In the face of a properly supported motion for dismissal, the plaintiff may not stand on her pleadings, but must, "by affidavit or otherwise, set forth the specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458

13

(6th Cir. 1991). A district court may decide to rule on the jurisdictional issue upon a full trial record, after an evidentiary hearing, or merely on the basis of a written record. *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir. 1980). This matter has been briefed by the parties and exhibits have been filed. There is no need for an evidentiary hearing and the motion will be decided on the record.

When a court decides the issue on the basis of the written record alone, plaintiff needs only to make a *prima facie* case of jurisdiction. To survive a motion to dismiss, plaintiff must "demonstrate facts which support a finding of jurisdiction." *Id.* The burden on plaintiff is relatively slight, and the court considers the record in the light most favorable to the plaintiff. Any conflicts between facts contained in the parties' pleadings must be resolved in the plaintiff's favor. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (the court does not consider facts proffered by the defendant that conflict with those proffered by the plaintiff); *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (a court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal). Dismissal under Rule 12(b)(2) is proper only if the specific facts alleged by plaintiff, taken as a whole, fail to state a *prima facie* case for personal jurisdiction. *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 478 (6th Cir. 2003). Thus, as long as the plaintiff is able to "demonstrate facts which support a finding of jurisdiction," the motion to dismiss will be denied, even in the face of controverting evidence presented by the moving party. *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).

In order for a non-resident defendant to be subject to the jurisdiction of a court, the defendant must have "certain minimum contacts. such that the maintenance of a suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A defendant's minimum contacts with the forum state may create two types of personal jurisdiction, general or specific. *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014).

General jurisdiction over a defendant exists where the defendant's contacts with the forum state are "continuous and systematic," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011), such that a defendant should "reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The complaint alleges that H&D Int'l is an international information technology provider that has its headquarters in Wolfsburg, Germany. In North America, its services are offered through its subsidiary H&D. Everett does not argue that H&D Int'l is subject to general personal jurisdiction in the Eastern District of Tennessee. Therefore, the court will analyze whether specific jurisdiction exists over H&D Int'l.

Specific jurisdiction allows a defendant to be sued in the forum state only where the issues of the suit derive from or are connected to the contacts that establish jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). The existence of specific jurisdiction is determined by looking at the relationship among the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). For a court to exercise specific jurisdiction that is consistent with

constitutional due process, the defendant's "suit-related conduct must create a substantial connection with the forum state." *Walden v. Fiore*, 134 S. Ct. 115, 1121 (2014).

The Sixth Circuit has established a three-part test to determine whether the court may exercise specific jurisdiction over a particular defendant. First, the defendant must purposefully avail itself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over defendant reasonable. *Southern Machine Co. v. Mohasco Indus. Inc*., 401 F.2d 374, 381 (6th Cir. 1968).

### A. Purposeful Availment

Purposeful availment is considered the most important requirement. *Id.* The defendant must have purposefully availed itself of the "privilege of acting in the forum state or causing a consequence in the forum state." *Id.* Requiring that the defendant take purposeful steps in the forum state ensures a defendant's "random, fortuitous, or attenuated" contacts with the forum state will not subject it to being haled into court there. *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985). Additionally, the defendant's relationship with the forum state must arise out of the contacts the *defendant itself* created with the forum state. *Id.* The unilateral activity of the plaintiff or a third party cannot be the basis of exercising personal jurisdiction over the defendant. *Id.* Although not decisive, the plaintiff or third party's contacts with the forum state may be significant or important to the due process analysis because the defendant's contacts with the forum state may be

16

intertwined with transactions with the plaintiff or third party. *Walden*, 134 S. Ct. at 1122. The physical presence of the defendant itself in the forum state is not required for a court to have personal jurisdiction over the defendant; however, the minimum contacts requirement must still be met. *Int'l Shoe*, 326 U.S. at 316.

Here, the Complaint alleges that H&D Int'l exerted control over Everett while she was working for H&D in Chattanooga, Tennessee. H&D Int'l controlled her travel and schedule between Tennessee and Michigan where the discrimination took place. H&D Int'l paid Everett while she was working for H&D in Tennessee. And, H&D Int'l received Everett's complaints regarding the requirement she travel from Tennessee to various client locations. Further, H&D Int'l lists jobs in Chattanooga; lists Chattanooga as one of its international locations on its website; and directly contracted for and provided services in Chattanooga. Viewing these facts in the light most favorable to Everett, she has established H&D Int'l engaged in conduct directed toward Tennessee under the purposeful availment prong.

### B. Arising From

The second criterion under *Southern Machine* asks whether the plaintiff's claims "arise from" the defendant's contacts with Tennessee. The Sixth Circuit has observed that the "arising from" prong is met when the operative facts arise from the defendant's contacts with the state. *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002). Here, the operative facts for Everett's claims are clearly related to H&D Int'l contacts with her in Tennessee. When a defendant has purposefully availed itself of acting in the forum, then the cause of action naturally arises from the defendant's activities in the forum state.

### C. Reasonableness

The third prong of the *Southern Machine* test requires the exercise of personal jurisdiction over the defendant in the forum state be reasonable. *Southern Machine*, 401 F.2d at 381. This requires a substantial connection between the forum state and the acts of the defendant or the consequences caused by the defendant. *Id.* Where the first two criteria of the Southern Machine test are met, "an inference of reasonableness" arises such that only the unusual case will not meet the reasonableness prong. *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991).

When a defendant has purposefully directed its actions to the forum state or its residents, the defendant is required to present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* Such considerations include the following factors: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interests in securing the most efficient resolution of the controversy. *Id.* This issue may be disposed of relatively easily because the defendant faces an inference of reasonableness and has presented little to show that defending this suit in Tennessee is unreasonable or burdensome.

H&D Int'l exerted control over Everett's activities in Tennessee, and she suffered damages from the actions of H&D Int'l directed toward her in Tennessee. Tennessee has an interest in enforcing its laws and protecting the interests of its citizens. The court finds there is a sufficiently substantial connection between H&D Int'l and Tennessee to make the exercise of personal jurisdiction over H&D Int'l fair and reasonable. The motion to

18

dismiss the claims against H&D Int'l on the grounds that this court lacks personal jurisdiction over H&D Int'l is denied.

In conclusion, the court finds defendants' motions without merit and the motions to dismiss [R. 12, 16] are **DENIED.**

**IT IS SO ORDERED**.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**